## SINCLAIR REFINING CO. v. JENKINS PETROLEUM PROCESS CO.*
### No. 3318.

Circuit Court of Appeals, First Circuit.

Sept. 27, 1938.

*Writ of certiorari denied 59 S.Ct. 362, 83 L.Ed. ——.

Nathan L. Miller, of New York City (Frank E. Barrows, of New York City, and Robert Hale, of Portland, Me., on the brief), for appellant.

Howard A. Hartman and David Fox, both of Milwaukee, Wis. (Henry Herrick Bond, of Boston, Mass., Philip G. Clifford and Richard S. Chapman, both of Portland, Me., John Howley, of New York City, Frederick Schafer and Russell C. Jewell, both of Washington, D. C., and John J. McKeague, of Chicago, Ill., on the brief), for appellee.

Before WILSON and MORTON, Circuit Judges, and McLELLAN, District Judge.

WILSON, Circuit Judge.

This is an appeal from the District Court of Maine in an action at law to recover for an alleged breach of a contract under date of October 2, 1916, under which the defendant agreed to cause its employees to execute applications for patents for any improvements which it or its engineers and experts might develop in a certain apparatus or process claimed to have been invented by the plaintiff for cracking crude petroleum oils for the recovery of the lighter oils, including gasoline, and to assign said applications, together with the improvements they were intended to protect, to the plaintiff.

A suit in equity was originally brought in January, 1921, to compel a specific performance of the contract. Specific performance was denied by the District Court for lack of sufficient evidence to warrant such a decree and the bill was dismissed. On appeal to this court the decree of the District Court was in part affirmed, but the appeal was dismissed without prejudice and the case was remanded to the District Court with directions to transfer it to the law side, and with permission to the plaintiff to amend its bill of complaint within thirty days by filing a declaration at law for a breach of contract.

The history of the litigation over this contract, prior to the judgment at law from which this appeal was taken, will be found in D.C., 273 F. 527; D.C., 32 F.2d 247; 1 Cir., 32 F.2d 252; D.C., 38 F.2d 820; D.C., 56 F.2d 272; 1 Cir., 62 F.2d 663; 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496; D.C., 6 F.Supp. 67.

Following the mandate in the equity suit, a declaration at law was filed, and a motion by the defendant to strike out and dismiss on the ground that the proposed declaration at law set forth a different cause of action from that described in the complaint in equity. The motion of the defendant was denied and an exception taken.

On May 15, 1930, a third count as an amendment to the declaration at law was proposed and objected to and exceptions taken to the allowance.

Defendant then filed a plea of general issue with a brief statement of defense, on which issue was joined, and the case was continued from term to term until the December Term, 1936. On March 29, 1937, the case went to trial before a jury. At the close of the evidence on April 23, 1937, the defendant filed a motion for a directed verdict, which was denied and exceptions taken. Whereupon the jury rendered a verdict for the plaintiff for $2,000,-000.

A motion for a new trial by the defendant was overruled. From a judgment on the verdict the present appeal was taken to this court. The defendant filed twenty-five assignments of error.

The case was carefully tried during a trial of five weeks, but with astute and experienced counsel on both sides, by whom every point involving a question of law was strenuously contested, it would be unusual if some error did not appear, either in the admission or exclusion of evidence, or in instructions to the jury, either requested or refused.

An attempt to analyze the mass of evidence pro and con in the case would of necessity be futile within reasonable limits of an opinion.

It is only necessary to consider assignments of error numbered 4, 5, 8, 9, 10 and 12.

We find it unnecessary to discuss assignments 1, 2 and 3 which raise some doubtful questions of pleading under the state practice. We shall first consider assignments of error relating to the admission and exclusion of evidence, viz., 5, 8, 9, 10 and 12.

The District Judge excluded evidence of the prior art bearing on the construction and scope of the Jenkins and Isom patents, and on the question of whether Isom was an improvement in Jenkins, which was assigned as error under assignment No. 5; on the question of damages he excluded evidence bearing on the validity of the Isom patent, and its anticipation by the patent issued to the Russians, Schuchow and Gavrilow, in 1891, and received in the United States Patent Office on March 3, 1897, which was assigned as error under assignments 8 and 9; he also excluded the facts relating to an interference between the Isom patent and an application of one Dubbs, which was filed before the application of Isom and assigned as error under assignment No. 10; the testimony of E. W. Isom in the action of the Sinclair Refining Company v. Globe Oil & Refining Company, D.C., 20 F.Supp. 681, was admitted, which related to the amount of gasoline extracted during a given period by the Isom stills, which was assigned as error under assignment No. 12.

We think the evidence relating to the scope and validity of the Isom patent should have been received, notwithstanding the stills constructed under the Isom patent had been in use by the defendant for many years without objection or claim of infringement. Isom obtained the patent on his still by claiming that vertical tubes were new. The Russian patent was not called to the attention of the Patent Office, when the application for the apparatus patent of Isom was pending, but when his divisional process patent was under consideration the Russian patent was

cited, and the process patent was refused on the ground of anticipation by the Russian patent.

The jury was instructed that prima facie the Isom patent was a valid patent, and the jury must have weighed the evidence in view of this instruction. In cross-examination the plaintiff's expert, Darnell, testified as follows: "Q. Then wouldn't you think as an expert qualifying to pass judgment on the value of a patent that you would need to take into account whether or not the particular patent you were evaluating was one which would enable its owner to exclude other people from practicing the same thing? A. Certainly that would be a factor." "Q. But you didn't do it? A. No, I assumed this was a valid patent."

The excluded evidence of the Russian patent of Schuchow and Gavrilow and the other prior art patents offered and excluded would have shown, if admitted, that Isom's vertical tubes on which his patent was based and forced mechanical circulation were anticipated by more than twenty years, and were in the public domain. Jenkins was free to use them as well as the defendant.

This appeared when Isom applied for a divisional process patent for oil cracking and the Russian patent was cited against it. A process patent was denied. The Court of Appeals of the District of Columbia in the Dubbs interference case, Isom v. Dubbs, 58 App.D.C. 25, 24 F.2d 467, stated in its opinion that the Isom apparatus patent had been inadvertently issued, no doubt in view of the Russian patent, which was not cited when Isom's application for an apparatus patent was considered.

This evidence, if it had been admitted, would have shown that Isom's parallel vertical tubes and the mechanical forced circulation of oil through tubes and tank had all been anticipated. The two features in the Isom patent which were claimed by the plaintiff to be an improvement in Jenkins, viz., vertical tubes and a balanced stuffing box, were both old and left nothing of value in the Isom patent to be assigned to the plaintiff under the letter-contract in suit hereinafter referred to. Therefore, even if the improvements claimed by the plaintiff had been assigned in accordance with the letter-contract, they could have added nothing of value to the Jenkins patent, and the failure to

assign them deprived the plaintiff of nothing of value. The effect of the contract of October, 1916, was merely to assign any patent obtained by the defendant on improvements in the Jenkins process, if within the contract, for whatever it might be worth. Hence the actual damage suffered by the plaintiff through the failure to assign to it the Isom alleged improvements in accordance with the letter-contract of October, 1916, could not have been more than nominal, even assuming the so-called improvements claimed by the plaintiff were the result of the Isom engineers and experts familiarizing themselves with the Jenkins still under the contract of October, 1916.

The testimony of E. W. Isom in the case of Sinclair Refining Co. v. Globe Oil & Refining Co., 20 F.Supp 681, should have been excluded. The case against the Globe Oil & Refining Co. involved a claim of infringement of certain patents issued to one Bell and assigned to the defendant, by which continuous operation of the Sinclair still was greatly increased and consequently the production of gasoline. The District Court ruled in the law action that special profitable uses of the Isom patent could not be considered on the question of damages, but in the Globe Oil & Refining Co. Case evidence given by E. W. Isom as to the efficiency of the Isom patent, with the addition of the Bell inventions, was admitted as bearing on its commercial use.

The defendant did not deny the usefulness of its invention, but utility and invention are not alone sufficient to warrant the issuance of a patent. There must also be novelty. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 453, 79 L.Ed. 997; Walker on Patents (6th Ed.), Sec. 91.

The District Judge expressed doubt as to the admissibility of this evidence at the time it was offered. The plaintiff, however, was permitted to put in the testimony of E. W. Isom as to the output of the Isom stills in 1927. Judge Nields stated in his opinion in that case:

"His (Bell's) inventions are effective in surmounting the carbon carrier when used in practice, either (with) the batch process or the continuous process. The plaintiff (the Sinclair Company) turned at once to continuous cracking with the Bell patents. In the latter part of 1920 a battery of stills was equipped with the Bell

inventions. For the first time in history continuous cracking to produce gasoline was practiced commercially. All subsequent commercial cracking has been continuous."

Judge Nields found that these Bell inventions were finally embodied in all of the defendant's commercial cracking stills, and that the large increased output of the defendant's stills was due, not to the Isom patent alone, but to the added improvements by Bell.

The figures of the production of these stills in 1927 were used by the plaintiff's expert, Darnell, in his estimates of the damages suffered by the plaintiff due to the defendant's alleged breach of the letter-contract of October, 1916. Such evidence of profitable use the District Judge and this court had ruled were inadmissible on the question of damages. Jenkins Petroleum Process Co. v. Sinclair Refining Co., supra, 62 F.2d page 665. The District Court, in accordance with the ruling of this court in Sinclair Refining Co. v. Sinclair Refining Co., supra, 62 F.2d page 665, instructed the jury: "You are not authorized to consider any damages based on profits Sinclair might or could have made. These are recoverable only in infringement suits and not in this form of action." No exception was taken by the plaintiff to this instruction. The jury was bound by it and its soundness under all circumstances is not before this court.

It further appeared that E. W. Isom was available as a witness. If it be assumed, without so deciding, that where a corporate officer is available as a witness, his testimony in a different case may ever be received as in the nature of a corporate admission, this is not such a case.

Unless the plaintiff has some effective reply, which we do not find in the record, to the defendant's contention that the use of vertical tubes and forced mechanical circulation had long been anticipated by the Schuchow and Gavrilow patent and was in the public domain, the Isom patent must be held invalid. It also appeared in evidence that E. W. Isom, prior to October, 1916, was familiar with the several patents issued to Smith, Cross, Clark, Edwards, Waxler and Sapp, which related to the cracking of crude oils and the distillation of gasoline, and showed a tank and tubes with forced mechanical circulation, in which tubes the crude oil was subjected to cracking heat, though the tubes

in the last named patents were not vertical. The exception to the exclusion of this evidence of the prior art must be sustained.

While some evidence of the prior art was admitted for the purpose of showing the state of the art in 1916, if all the evidence of the prior art offered by the defendant had been admitted showing anticipation of the vertical tubes and balanced stuffing box of the Isom patent, and to show the scope of the Isom patent, the prima facie evidence of validity of the Isom patent would have been destroyed and the District Court must then have instructed the jury that the Isom patent issued in 1918 was invalid.

The only reply the plaintiff makes to the defendant's claim of admissibility of this evidence is that the defendant is estopped to set up invalidity of his patent. But this is not a case of assignor and assignee, or licensor and licensee, where the assignor or licensor is presumed to represent the validity of that which he assigns or licenses.

There is obviously no estoppel by deed, nor are the elements present to constitute an estoppel in pais, or equitable estoppel. To constitute such an estoppel all the essential elements must be present, among which is ignorance of the true facts on the part of the person claiming the estoppel. The general rule is that one may not to the prejudice of the other party deny any position taken in a prior judicial proceeding between the same parties or their privies involving the same subject matter, if successfully maintained. Gordon v. Hutchins, 118 Me. 6, 105 A. 356; Pratt v. Paris Gas Light & Coke Co., 168 U.S. 255, 18 S.Ct. 62, 42 L.Ed. 458.

But in the event of a dismissal of the action in which the position was taken without any binding judgment, as in case of a non-suit or dismissal without prejudice, the fact that such a position was taken in a prior action may be admissible as evidence between the parties, but is not conclusive. Waterman v. Merrow, 94 Me. 237, 47 A. 157; Pratt v. Paris Gas Light & Coke Co., supra; Carleton v. Bird, 94 Me. 182, 47 A. 154; Jackson v. Allen, 120 Mass. 64.

There is no claim that the plaintiff was ignorant of the prior art, and the legal presumption is that all patentees and all patent owners are presumed to be familiar with the prior art. Adams v. Galion Iron

Works & Mfg. Co., 6 Cir., 42 F.2d 395, 397; John T. Riddell, Inc., v. P. Goldsmith Sons Co., 6 Cir., 92 F.2d 353, 356. There was no evidence that the plaintiff was injured by an unexpected claim of Isom in the law case that his patent, in view of the prior art, was invalid.

The issue raised in the prior equity case was not one of valuation of the Isom patent and of damages, but whether the plaintiff was entitled to a specific performance of the contract of October 2, 1916. The District Court and this court held the evidence did not warrant such a decree. The issues not being the same, since the issue of the validity of the Isom patent was not raised by the equity pleadings nor determined in that case, and the equity case being dismissed without prejudice, there was no estoppel in pais, or equitable estoppel, against the defendant raising the question of validity of the Isom patent on the question of damages in a law action for breach of the contract. Therefore, the evidence of the prior art bearing on the scope and validity of the Isom patent, and the facts and decision in the Dubbs interference case bearing on the validity of the two claims of the Isom patent, should have been received on the question of damages.

But notwithstanding these errors in the admission and exclusion of evidence which would alone require the granting of a new trial, the exception to the denial of the motion of the defendant for a directed verdict after the evidence was all in, which was assigned as error under assignment of error No. 4, goes deeper into the real issue of the case, namely, the proper construction of the contract entered into between these parties under date of October 2, 1916, and whether there was any evidence of information obtained by or imparted to the defendant, or to any of its engineers and experts under the contract, which enabled E. W. Isom to conceive the claimed improvements in the Jenkins patent.

In stating the facts bearing upon the question whether a verdict for the defendant should have been directed, we recognize a jury's right to reject testimony as not entitled to credit, but it must also be understood that disbelief of testimony does not constitute affirmative evidence of the contrary.

The material part of the letter-contract of October 2, 1916, reads as follows:

"Pursuant to our conversations and conferences relative to the Jenkins process of treating petroleum, it is understood that we (the plaintiff) are to loan you our experimental still to be shipped to Coffeyville, Kansas, so that your experts and engineers may have apparatus immediately available upon which to carry out experiments upon the Jenkins improved process upon your petroleum products.

"It is further understood that Mr. Ulysses S. Jenkins, of Chicago will go to Coffeyville, Kansas, to install the still and will remain in an advisory capacity throughout the entire course of experimental work carried on by your experts, Mr. Jenkins' salary being $150.00 a month, and all expenses, including railroad expenses incurred by him in making trips to Chicago, rendered necessary by said experimental work, this to be paid by you.

"It is further definitely understood and agreed between us that any improvements, whether of a mechanical nature, or in the process, which may be developed as the result of the work of your engineers and experts in familiarizing themselves with the Jenkins apparatus and process, shall accrue to the Jenkins Petroleum Process Company, and that you shall, so far as you are able to do, cause your employees carrying on such experimental work to execute applications for patents for the United States and any other countries to protect any such improvements, but at the expense of Jenkins Petroleum Process Company, and to assign said applications, together with the improvements they are intended to protect, to the Jenkins Petroleum Process Company. This provision is of course rendered necessary by the fact that in development of a process of this character, and particularly in its application to particular oils, many short cuts and improvements necessarily are developed by the experts entrusted with the carrying out of the process, which belong by right to their employer, and under the circumstances here involved, of course, to the Jenkins Petroleum Process Company, inasmuch as they are loaning you not only their experimental still, but also the services of Mr. Jenkins, the inventor himself.

\* \* \* \* \* \*

"As soon as your engineers and experts have carried on sufficient work with this still to thoroughly familiarize themselves with the process and discover *the best conditions under which to apply the proc-*

*ess to your petroleum products,* the still will be returned in good condition to us." (Italics supplied.)

The particular improvements in Jenkins claimed by the plaintiff's witnesses as a result of the defendant's engineers and experts familiarizing themselves with the Jenkins still under the contract of October, 1916, were the use of vertical tubes and a balanced stuffing box.

There was a difference of view between the parties as to the proper construction of the contract, which was for the court to determine.

In the equity case the court ruled that a broad construction was to be given the contract because of a claim by the plaintiff of confidential disclosures. D.C., 32 F.2d 247, 250, 251. The claim of confidential disclosures being abandoned in the law action, the broad construction contended for by the plaintiff in the equity case was not pressed in the law action.

The construction put upon the contract in the law action by the District Judge in his charge to the jury was that improvements resulting from disclosures prior to the date the contract was executed, which was sometime between October 2, 1916, and October 9, 1916, were not within the contract and also that any disclosures in connection with the negotiations for the sale of the stock of the Jenkins Company after October 2-9, 1916, were not covered by it; but he also instructed the jury "that any information gained by the defendant's engineers and experts while so familiarizing themselves under the opportunity given them under the contract at Coffeyville, was proper to be shown in support of the plaintiff's contention." His instruction on this point was as follows:

"At the outset the question arises as to construction of contract in respect of the source of information chargeable to the defendant and the time in which it must have been received. Strictly construed the contract would be limited to information gained by experimentation. If that alone is covered by the contract, there could scarcely be any recovery, because no experiments were ever made or witnessed by the defendant's people after they received the still. However, I prefer to give more effect to the words 'familiarizing themselves with the Jenkins apparatus and process'. And I rule that any in-formation gained by defendant's engineers and experts while so familiarizing themselves under the opportunity given them under the contract and as a result thereof is proper to be shown in support of the plaintiff's contention. The defendant claims that disclosures made by the plaintiff to the defendant before the date of the contract, that is, before October 2, 1916, cannot be considered as having been made under the contract; and that any disclosures made by plaintiff to defendant in the course of the negotiations having to do with the license or sale agreement were wholly unrelated to the contract and that, therefore, no improvements made by defendant as the result of its familiarity with the plaintiff's process gained from such disclosures are covered by the contract.

"If the only information given the defendant by the plaintiff and the only information obtained by the defendant was that mentioned, that is before the contract was entered into and while negotiations for a license or sale and solely as a part of such negotiations, in the way information was freely given to others by the plaintiff in connection with proposed license agreements about that time, then it would be apparent that defendant gained no familiarity with the Jenkins apparatus and process through any action of the plaintiff under the contract, and it would have no ground for recovery in this suit."

A doubt had arisen as to what was intended by the words "familiarizing themselves with the Jenkins apparatus and process," and the District Court instructed the jury that, if construed strictly as being limited to information obtained by experimentation, the plaintiff could not recover, as no experiments were made at Coffeyville under the contract; but added: "I prefer to give more effect to the words 'familiarizing themselves with the Jenkins apparatus and process.' And I rule that any information gained by defendant's engineers and experts while so familiarizing themselves under the opportunity given them under the contract and as a result thereof is proper to be shown in support of the plaintiff's contention."

The contract is clear, at least, as to the purpose and the object of the shipment of the still to Coffeyville, and should be interpreted in the light of the circumstances under which it was entered into.

Jenkins and his associates, A. G. Maguire, W. H. Black and T. S. Black, sometime in the summer of 1916, advanced a small amount of money to construct an experimental still to test out an idea of Jenkins for cracking crude petroleum oils and extracting therefrom gasoline, which, with the advent of automobiles and the demand caused by the great war, was much sought for by the refining and producing oil companies, especially in the period from 1912 to 1917. The chief difficulty encountered before had been the deposit of carbon in the cracking stills through applying the heat necessary to break down the atoms of hydrocarbon contained in the crude oil. Jenkins' theory was that rapid circulation of oil, subjected to cracking heat, would prevent the deposit of carbon in any considerable quantity, and his experimental still consisted of a tank containing a supply of oil and descending and ascending pipes connected with parallel inclined tubes subjected to great heat, with a mechanically forced circulation through tank and tubes by means of a screw propeller.

E. W. Isom, a son of W. H. Isom, president of the Cudahy Refining Company, was a trained engineer, having graduated from a scientific mining school, and in 1912 became assistant to his father and at once took up the problem of the study of cracking crude oil for the purpose of increasing the production of gasoline in addition to other duties.

His studies of the subject and investigation extended from 1912 to 1917. During this time he investigated every patent issued which had any relation to the subject, read all the literature published in connection with it, including the Rittman Publication, so called, issued by the Bureau of Mines of the Department of the Interior, giving the state of the prior art and from which Jenkins evidently received a suggestion for his claimed invention. In midsummer of 1916, one of the Blacks called W. H. Isom's attention to the Jenkins process, and Maguire, one of the organizers and promoters of the Jenkins Company, on July 7, 1916, wrote W. H. Isom that "W. C. Black will see you and explain the principles and show you the prints of our cracking process." The prints which he referred to in this letter were the patent prints. W. C. Black testified that, during the summer of 1916, "I very frankly explained to Mr. Isom everything I learned about the operation

from my visits to the little still. * * * Mr. Isom was anxious to have his son, Edward, come up and make his own investigation, make his own determinations. He wanted a real oil man up there that understood oil technology and oil refining. So after a few runs we felt that we had gotten far enough to where it would be interesting and we announced to him that our people were perfectly willing to let Edward (Isom) come up, go out and see for himself, make whatever determinations he cared to. That was sometime around the middle of August."

Maguire also testified that in July, 1916, *he explained to W. H. Isom in detail the theory of the Jenkins patent and process.* W. H. Isom called his son's attention to the Jenkins patent and suggested that he investigate it, as he always did when a new idea was presented. E. W. Isom was then investigating other processes and, in addition, had charge of the erection of commercial stills for the cracking of crude oils; but, as the record shows, was even then making plans in his own mind from his investigation of the prior art for a process and still which was later perfected with the help of Professor John E. Bell, who also invented a so-called lobe pump for forcing circulation. Patents for Bell's improvements were issued and assigned to the defendant.

Maguire in 1916 assured W. H. Isom that they had experimented with the Jenkins still and found that it did all they claimed for it, and before it had even been demonstrated to the Isoms he had tried to interest W. H. Isom in the purchase of it, or to take licenses under the patent. W. H. Isom replied that his son would first want a demonstration of the Jenkins still and its ability to produce gasoline from the products of the Cudahy Company, which Jenkins then undertook to do at his garage in Chicago. E. W. Isom came to Chicago in the latter part of August, 1916, to witness a demonstration of the Jenkins still and its operation, but apparently for lack of a proper stuffing box, or some other defect, it failed to work. E. W. Isom as an engineer saw at once this lack of a proper stuffing box, while watching the attempted demonstration, and suggested that an expert stillman might remedy the trouble, or could assist Jenkins in the demonstration of his still, and agreed to send an expert stillman from the Cudahy plant at Coffeyville to Chicago to

assist Jenkins in demonstrating his experimental still, which he did.

In making another attempt to operate the still, it caught fire from some defect in the apparatus and burned up the garage in which it was kept.

Prior to this time sketches, blueprints, and a copy of the specifications and cuts contained in his applications for his patent of the Jenkins still had been furnished the Isoms, showing in detail the construction of the Jenkins still and the theory on which it was supposed to work. The Isoms, however, wanted a practical demonstration of the Jenkins still and its ability to produce 100 percent gasoline from crude oil and to determine whether it would work with the oil produced by the defendant company. Black and Jenkins were in doubt as to its condition after going through the fire, but Maguire evidently did not think that the fire had damaged it beyond repair, and W. H. Isom told him that their expert welder at their plant at Coffeyville could probably weld any leak that had developed by reason of the fire. W. H. Isom suggested that the still be shipped to Coffeyville, where they had every convenience for making a test and their welder could repair any damage caused by the fire.

Maguire, however, after conferring with the Blacks and Jenkins, decided that some agreement should first be drawn up that would protect them in case any improvements in the apparatus or process were made by the engineers or experts of the Cudahy Company while the experiments were going on, and would assure the Jenkins Company of the benefit of any such improvements. In consequence, it was agreed among the promoters that a contract should be drawn up setting forth the purpose for which the still was shipped to Coffeyville, and that any improvements due to the defendant's engineers and experts familiarizing themselves with the Jenkins still should belong to the plaintiff, and that the engineers and experts conducting the experiments should apply for patents and assign such applications and improvements to the plaintiff company. Maguire, without further consultation with W. H. Isom, had a lawyer draft the letter-contract in the case dated October 2, 1916, which, sometime after its date, was signed and approved by W. H. Isom, president of the Cudahy Company.

The still was shipped on October 9, 1916, and was set up on foundations which had been prepared for it. On a test with cold oil, but not under pressure, it was found to leak, and three or four attempts were made to weld it by an expert welder of the Cudahy Company; but he failed to make it tight, and no tests thereafter, with oil or even water, were or could be made under pressure. It was finally abandoned in November, 1916, and never served any useful purpose except as a place in which the birds might build their nests.

The construction of this letter-contract of October, 1916, therefore, becomes important. The plaintiff claims that, through opportunity thus furnished the Isoms to familiarize themselves with the structure of and process involved in the Jenkins still, E. W. Isom developed an improved still along the same lines as the Jenkins still, for which he later obtained a patent for the apparatus and which, in violation of the contract, he assigned to the defendant. The defendant contends that Isom's patent was the result of his engineering training, knowledge and familiarity with the prior art; that he received no additional aid from such opportunity as he had to examine the Jenkins still at Coffeyville under the contract, and that the character of the circulation in his still was quite different from that of Jenkins.

The purpose of the contract as expressed therein for the breach of which this suit was brought, was to provide the Isoms first with an opportunity to carry on experiments in order to determine the effectiveness of the Jenkins patent on their own products. It is clear from the record that no such experiments were made, or could have been made, at Coffeyville. The contract also further provided that, as soon as the engineers had carried on sufficient work to familiarize themselves thoroughly with the process and discover the best conditions under which to apply the process to the petroleum products of the Cudahy Company, the still was to be returned to the Jenkins Company in good condition.

It is evident that neither of the purposes mentioned were, or could have been, carried out. The engineers and experts could not operate the still, nor was anything done at Coffeyville that could possibly add to the knowledge of the Jenkins process already furnished the Isoms by W. C. Black and Maguire and by what

E. W. Isom and the stillman, Blair, learned at the attempted demonstration at Chicago prior to the execution of the contract, and, of course, nothing was or could have been done under the contract to test the still or process on the petroleum products of the defendant, which was one of the purposes for which the still was shipped to Coffeyville.

The provision that any improvements, whether of a mechanical nature or in the process, which might develop from the result of the work of the engineers and experts of the defendant in familiarizing themselves with the Jenkins apparatus and process, should accrue to the Jenkins Company was obviously inserted to avoid overreaching of the plaintiff by the defendant through information gained in development work.

But no evidence was offered to show that any such results as those described in the letter-contract came from any knowledge obtained by the engineers or experts while the still was at Coffeyville, and the jury had no basis for drawing any such inference. The burden was on the plaintiff to satisfy the jury by evidence whether any such improvements claimed by the plaintiff as the vertical tubes and balanced stuffing box were suggested to the Isoms as a result of familiarizing the engineers and experts of the defendant with the Jenkins still while at Coffeyville. Inference from opportunity alone is not evidence, especially against categorical denial by witnesses. Such an inference could only result from mere conjecture. E. W. Isom was an expert oil engineer. To say that, with the information already imparted to the defendant, including the sketches, specifications and a description of the Jenkins device contained in the application for the Jenkins patent, and from what he saw at the attempted demonstration in Chicago, he did not have a clear idea of the theory of the Jenkins still and process prior to October, 1916, would be to say something prima facie improbable and requiring proof to support it. Such proof is not furnished by the fact that the still was set up at Coffeyville, and he had an opportunity there to gain additional knowledge of the Jenkins apparatus and process over what he already possessed prior to October, 1916. There was no evidence that he in fact gained any such knowledge. He had doubts of its practicability from the first and as he wrote his

father, one of the Blacks is too full of theory. That it was set up in a row of small houses locally known as "Bug Row" indicated that it was not regarded by the Isoms as a complete success, but something that required an experimental demonstration to satisfy E. W. Isom of its practicability.

E. W. Isom at once saw a defect in the Jenkins apparatus at Chicago and told Jenkins it would have to be remedied. From his familiarity with the prior art and from his engineering knowledge, he was convinced that vertical tubes, which proved to be in the public domain, would be more effective than the inclined tubes of the Jenkins apparatus, and that a balanced stuffing box, which was old in the prior art, was essential to any success of the Jenkins apparatus. A plaintiff's expert also agreed that a balanced stuffing box was old. Neither of these improvements or suggestions resulted from any, experiments tried on the still after it was shipped to Coffeyville, or any information gained by E. W. Isom while the still was there. As before stated, he had a description of it in the application for the patent, and his father had had the details and theory of it explained to him prior to October, 1916. E. W. Isom was familiar with the Clark, Cross, Smith and Waxler patents in the prior art. The testimony showed that he had investigated every patent and process for cracking gasoline that had already been granted.

If there had been any experiments or demonstrations attempted with the still while at Coffeyville, there might have been an inference warranted of information gained beyond what the sketches and specifications in the application for the patent, and what his examination of the still at Chicago showed and beyond what he learned from the explanation of Maguire as to the theory on which the Jenkins apparatus was supposed to work; but no such experiments were made. The judge so instructed the jury. The record does not show that E. W. Isom even examined the still while at Coffeyville. As has been said, it was never in a condition to operate while there. The contention of the plaintiff that his testimony is contradicted by Jenkins and Blair, his expert stillman, is not borne out by the record as to Blair. Blair had no recollection of E. W. Isom examining the still at Coffeyville, or of making a report to him, and

even if Isom called at the place where the still was operated nearly every day, as testified to by Jenkins, it was never in operation. The plaintiff infers that Blair made some report to E. W. Isom because it was his custom to do so when sent to examine a new process. E. W. Isom was in Chicago much of the time while the still was at Coffeyville. Someone evidently reported that it could not be made tight and experiments were abandoned in November, 1916.

Because E. W. Isom suggested that sketches of the Jenkins still be forwarded to Coffeyville, and that Jenkins should come down and assist in setting it up, it is urged that E. W. Isom and Blair needed further information as to the nature of the apparatus; but the sketch was one promised to be forwarded by Jenkins with the still, and the contract required that Jenkins should go to Coffeyville if called upon. It was natural that E. W. Isom should want the setting up of the apparatus to be supervised by the inventor in order that nothing should interfere with its proper working.

We think there is no evidence in the record from which the jury was warranted in drawing the inference that E. W. Isom appropriated any of Jenkins' ideas or made any improvements in his apparatus as a result of this letter-contract. The vertical tubes were not suggested by any experiments or as a result of any familiarity with the Jenkins still and process while at Coffeyville. The necessity of an improved balanced stuffing box was apparent to E. W. Isom when he witnessed the attempted demonstration in Chicago in August, 1916. Neither of these improvements came from any familiarity with the Jenkins still or process while at Coffeyville under the contract. To infer that something may have happened afterward, coupled with some information gained at Coffeyville as to the Jenkins process which was not known before, is to make an unwarranted excursion into the realm of conjecture. The jury was not warranted in doing this.

It was contended that, because certain measurements of the tank and tubes of the Isom still were substantially the same as those of the Jenkins still, Isom or his experts must have taken measurements and from these his improvements resulted; but how any similarity in the size of the tank and tubes in the Jenkins and Isom stills

could have suggested vertical tubes or a balanced stuffing box to Isom, which the plaintiff contends were the alleged improvements which should have been assigned to it, and failure to assign which is now claimed as a breach of the letter-contract of 1916, is beyond the realm of reasonable inference.

After considering the case in the jury room for twenty-four hours, the jury submitted the following questions to the court to guide them in their further deliberations, viz:

"If it is conceded that Isom improved in Jenkins, is it necessary that the plaintiff must show beyond reasonable doubt that Isom received definite information from Jenkins after October 2, 1916, in addition to what he had at that time, which enabled him to make such improvements?

"In other words, are we to consider any general information received by Isom from Jenkins after October 2, 1916, or are we to consider only such specific information so received as could have assisted Isom in making such improvements?"

In reply to the jury's questions, the court further instructed the jury:

"But it is not necessary that the plaintiff show that all the information which defendant had was received after the contract was made. If the defendant's people had information and ideas about Jenkins and the features in question, but did not connect such ideas with the ideas behind the improvements until other information was obtained by virtue of the contract, the plaintiff can recover if it can show that the information, which by itself or in connection with previous information was necessary to the result accomplished by Isom, was obtained under the contract.

"Such information may be general information as well as specific information. It is not necessary for the plaintiff to show the particular item of information which touched off the idea in Isom's mind; but it must be information, either general or specific, which was the cause of the development of the improvements. It must be information which, either by itself or in connection with previous information already in possession of the defendant, put together as a whole, enabled the defendant's people to make the improvements."

As we understand the judge's instruction to the jury in reply to their questions,

it was in substance that, if there were any substantial evidence in the record of additional information obtained under the contract of October 2, 1916, by the defendant, its agents or employees, while the Jenkins still was at Coffeyville, or afterward, which by itself, or coupled with any information already in the possession of the defendant or its expert, agents and employees, enabled E. W. Isom to make the alleged improvements in the Jenkins still, the jury might consider such additional information so obtained in the light of prior information already' in the possession of the defendant as to the construction of and the process in use in the Jenkins still.

But the jury had already been specifically instructed that any information as to the structure of the Jenkins still or the Jenkins process obtained or imparted to the Isoms prior to October 2, 1916, or any information relating to the same obtained in connection with negotiations between the defendant and plaintiff for the sale of the stock of the Jenkins Company to the defendant, could not be considered by the jury as obtained under the contract.

And, as previously stated above, it does not appear that E. W. Isom or any agent, expert or employee of the defendant obtained any additional information during the attempts to repair the still at Coffeyville, or afterward, which by itself alone could have suggested to E. W. Isom the alleged improvements in the Jenkins still. On the contrary, the record is bare of any substantial evidence of new information, either general or specific, received by the defendant, its agents or employees, under the contract after October 2, 1916, which by itself could have contributed to the development of the so-called improvements in the Jenkins still alleged to have been made by E. W. Isom, or any agents or employees of the defendant. To infer, therefore, that such information may have been obtained while the still was at Coffeyville, or afterward under the contract, is pure conjecture.

The plaintiff further contends that none of the questions now raised by the defendant's counsel were properly raised under the defendant's motion for a directed verdict, but the defendant's counsel made an oral motion in open court at the close of the evidence, in which he embodied the specific grounds of his motion, and at the court's suggestion made a written, general

motion, both of which motions were denied by the court and an exception taken.

To sustain the plaintiff's contention would result in a denial of justice. O'Halloran et al. v. McGuirk, 1 Cir., 167 F. 493, 494; Victor American Fuel Co. v. Tomljanovich, 1 Cir., 232 F. 662, 667, 668; Gordon v. Butler, 105 U.S. 553, 556, 26 L.Ed. 1166.

Taking all the evidence in its most favorable aspect for the plaintiff, we think there is no support in the record for the verdict.

The judgment of the District Court is vacated, the verdict is set aside and a new trial granted, and the case remanded to the District Court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal.